FILED

| Attorney or Party Name, Address, Telephone & FAX Numbers, State Bar Number & Email Address | FOR COURT USE ONLY |
|---|---|
| JESSE BANERJEE ( PRO-SE) 3573 3rd STREET SUITE 206 LOS ANGELES, CA 90020 TEL: (310)923-8788 Email: investigation@stevebanerjee.com | 2023 JUL 10  PM 2: 20 CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES BY _____ |
| ☒ Plaintiff(s) appearing without attorney ☐ Attorney for Plaintiff(s) | |

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - \*\*SELECT DIVISION\*\***

</div>

| In re: June 16, 2023 the plaintiff filed a request for entry of default by clerk aginst the interests of the defendant(s). Entry by clerk was entered on June 20, 2023. Civil Minutes <div align="right">Debtor(s).</div> | CASE NUMBER: CV23-3672 PA(PDx) ADVERSARY NUMBER: CHAPTER: SELECT CHAPTER |
|---|---|
| JESSE BANERJEE <div align="right">Plaintiff(s),</div> <div align="center">vs.</div> CHIPPENDALES USA INC/LLC <div align="right">Defendant(s).</div> | **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** DATE: 07/10/2023 TIME: 11:46 pm COURTROOM: ADDRESS: |

**TO THE DEFENDANT, DEFENDANT'S ATTORNEY AND OTHER INTERESTED PARTIES:**

1. Name of Defendant(s) against whom default judgment is sought (*specify name*):  CHIPPENDALES  USA/LLC

2. Plaintiff filed the complaint in the above-captioned proceeding on (*specify date*): 05/12/2023

3. The Summons and Complaint were served on Defendant by   ☐ personal service   ☒ mail service on the following date (*specify date*): 07/10/2023

4. A true and correct copy of the completed return of summons form is attached.

> *"Bankruptcy Code" and "11 U.S.C."* refer to the United States Bankruptcy Code, Title 11 of the United States Code.
> *"FRBP" refers to the Federal Rules of Bankruptcy Procedure. "LBR" and "LBRs" refer to the Local Bankruptcy Rule(s) of this court.*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

5.  The time for filing an answer or other response expired on (*specify date*): 07/20/2023

6.  No answer or other response has been filed or served by Defendant.

7.  The default of Defendant:

    a.  ☐ Has not yet been entered, but is requested

    b.  ☒ Was entered on (*specify date*): 06/20/2023

8.  **A Status Conference:**

    a.  ☐ Is scheduled for (*specify date, time, and place*): _____

    _____

    b.  ☐ Was held on (*specify date, time, and place*): _____

    _____

9.  As proof that Plaintiff is entitled to the relief requested in the complaint, Plaintiff:

    a.  ☒ Relies on the complaint and attached documents.

    b.  ☒ Attaches the following documents to establish a *prima facie* case:

        (1) ☐ Declaration of (*specify*): _____

        (2) ☐ Declaration of (*specify*): _____

        (3) ☒ Other (*specify*): US COURT OF APPEALS (USPTO) DECISION on OCTOBER 1, 2010

10. As further support for entry of a default judgment, Plaintiff submits a memorandum of points and authorities (optional).

11. **DECLARATION OF NON-MILITARY STATUS (**Servicemembers Civil Relief Act, 50 U.S.C. chapter 50 (§§ 3901-4043)). The undersigned party or counsel declares under penalty of perjury, with respect to each Defendant against whom a default judgment is sought by this motion:

    a.  ☐ Defendant is not currently in military service. The facts that support this statement are as follows (*see the court's website for information about how to verify non-military status*):

    b.  ☐ Defendant is currently in military service. The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the requirements in 50 U.S.C. § 3931(b)(2) to appoint an attorney for the Defendant before entering a judgment*):

    c.  ☒ I am unable to determine whether or not Defendant is in military service. The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the bond requirement in 50 U.S.C. § 3931(b)(3)*):

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2017                                           Page 2                                    **F 7055-1.2.DEFAULT.JMT.MOTION**

12. Defaulting party is not an infant or incompetent party.

Plaintiff requests that this court enter a default judgment in favor of Plaintiff.   A copy of the lodged proposed default judgment is attached.

Date: 07/10/2023

Respectfully submitted,

_____
Printed name of law firm

_____
Signature

JESES JESSE BANERJEE, ET Al
_____
Name of Attorney for Plaintiff or Plaintiff

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2017                              Page 3                              F 7055-1.2.DEFAULT.JMT.MOTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled: **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 07/10/2023   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 07/10/2023   , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
EVAN S. NADEL (CA Bar No 213230)
KILPATRICK TOWNSEND & STOCKTON LLP
ENadel@kilpatricktownsend.com
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 07/10/2023 | JESUS JESSE BANERJEE | |
| Date | Printed Name | Signature |

This form is mandatory  It has been approved for use in the United States Bankruptcy Court for the Central District of California.



# United States Court of Appeals
# for the Federal Circuit

---

(Serial No. 78/666,598)

**IN RE CHIPPENDALES USA, INC.**

---

2009-1370

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

---

Decided: October 1, 2010

---

STEPHEN W. FEINGOLD, Kilpatrick Stockton LLP, of New York, New York, argued for appellant. With him on the brief was MICHELLE M. GRAHAM.

CHRISTINA J. HIEBER, Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Alexandria, Virginia, argued for the Director of the United States Patent and Trademark Office. With her on the brief were RAYMOND T. CHEN, Solicitor. Of counsel was KRISTI L.R. SAWERT, Associate Solicitor.

---

IN RE CHIPPENDALES USA                                          2

Before DYK, FRIEDMAN, and MOORE, *Circuit Judges.*

DYK, *Circuit Judge.*

Appellant Chippendales USA, Inc. ("Chippendales"), appeals a decision of the Trademark Trial and Appeal Board ("the Board"). The Board affirmed the examining attorney's refusal to register the "Cuffs & Collar Mark" as inherently distinctive. We affirm.

### BACKGROUND

The applicant, Chippendales, is in the business of providing adult entertainment services for women. It opened its first strip club in Los Angeles in 1978. In 1979, Chippendales performers began wearing an abbreviated tuxedo—wrist cuffs and a bowtie collar without a shirt— as part of their act. This costume, referred to as the "Cuffs & Collar," was featured prominently in Chippendales' advertising and performances over the past several decades. It is set forth below:



In November 2000, Chippendales filed an application to register the Cuffs & Collar trade dress. In 2003, the

United States Patent and Trademark office ("PTO") issued Registration No. 2,694,613 for the Cuffs & Collar for "adult entertainment services, namely exotic dancing for women." U.S. Trademark Registration No. 2,694,613 (the "'613 mark"). A mark that is inherently distinctive qualifies for registration under the Lanham Trademark Act ("Lanham Act"). *See* Pub. L. No. 79-489, 60 Stat. 427 (1946) (codified at 15 U.S.C. § 1051 *et seq.*). A mark can also qualify for trademark protection under Section 2(f) of the Lanham Act if the mark has become distinctive through use in connection with the applicant's goods in commerce, known as acquired distinctiveness. *See* 15 U.S.C. § 1052(f) ("Section 2(f)").

Although Chippendales submitted evidence both of "inherent" distinctiveness and, alternatively, "acquired" distinctiveness under Section 2(f) of the Lanham Act, the examining attorney in 2003 concluded that the applicant was only entitled to a registration based on acquired distinctiveness. Because of the existing procedure at the PTO at the time of the decision, Chippendales could not contest the basis of the examining attorney's decision. The sole option at that time would have been for Chippendales to request that the registration be cancelled and that the mark be remanded for reconsideration. Chippendales was about to commence an infringement action based on the registration and thus opted not to initiate the cancellation of its registration under Section 2(f). The '613 mark became incontestable in 2008 under 15 U.S.C. § 1065.[1]

_____

[1]    Once a mark has been registered and in continuous use for five consecutive years subsequent to the date of registration, it becomes "incontestable" under the Trademark Act, thus resulting in additional benefits to the owner. *See* 15 U.S.C. § 1065. The registration for an incontestable mark is treated as "conclusive evidence" of

In 2005, Chippendales filed a second application, seeking again to register the Cuffs & Collar mark as inherently distinctive for "adult entertainment services, namely exotic dancing for women," in the nature of live performances. Chippendales claimed that it was entitled to a registration on the ground that the mark was inherently distinctive, even though it had secured a registration under Section 2(f). In the ordinary course, the PTO bars applicants from registering the same mark for the same goods and services. *See* Trademark Manual of Examining Procedure § 703 [hereinafter TMEP]. However, here Chippendales petitioned for—and was granted—a waiver of that procedure, to resolve "the underlying substantive issue as to whether the proposed mark is inherently distinctive." J.A. 664.

On September 5, 2007, the examining attorney issued her final Office Action refusing to register the Cuffs & Collar because the mark was not inherently distinctive. The Board affirmed. *In re Chippendales USA, Inc.*, 90 U.S.P.Q.2d (BNA) 1535, 1537 (T.T.A.B. Mar. 25, 2009). The Board held that it was bound to apply our predecessor court's decision in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977), to determine inherent distinctiveness.

On the merits, the Board concluded that the mark was not inherently distinctive under *Seabrook*. As we discuss below, *Seabrook* holds that a mark is not inherently distinctive if it, or a variation thereof, is in common use. 568 F.2d at 1344. The Board considered whether the mark was inherently distinctive "at the time applicant began to use the mark nearly 30 years ago." *Chippen-*

---

the validity of the mark, as well as its registration, ownership, and the exclusive right of the owner to use the mark in commerce. 15 U.S.C. § 1115(b).

*dales*, 90 U.S.P.Q.2d at 1538. The Board noted, however, that "[w]e are not suggesting that registrability should be determined at any time other than at the time the application is pending." *Id.* at 1538 n.6. The Board concluded that the Cuffs & Collar was a common basic shape design, because it is not unusual for exotic dancers to "wear costumes or uniforms which are . . . revealing and provocative." *Id.* at 1541. The Board also concluded that the Cuffs & Collar was not unique or unusual in the particular field of use, because costumes generally are common to the field of exotic dancing. *See id.* at 1542. ("[A]ll strippers begin their routine with some kind of fantasy outfit."). In reaching this conclusion, the Board cited examples of "various provocative costumes," such as "a stripper representing either a doctor wearing a stethoscope, or a construction worker wearing a utility belt, or a cowboy wearing chaps and a ten-gallon hat." *Id.* at 1541.

Alternatively, the Board concluded that the Cuffs & Collar mark was not unique or unusual in the particular field of use because it was inspired by the ubiquitous Playboy bunny suit, which included cuffs, a collar and bowtie, a corset, and a set of bunny ears. *Id.* at 1546. Finally, the Board concluded that the Cuffs & Collar mark "was a refinement of an existing form of ornamentation for the particular class of services," based on the same evidence discussed in the treatment of the first two *Seabrook* factors. *Id.* at 1542. The dissent disagreed, concluding that the Cuffs & Collar mark was in fact inherently distinctive. *Id.* at 1544–45. Chippendales timely appealed, and this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B).

## DISCUSSION

This court reviews the Board's legal conclusions de novo, and the Board's factual findings for substantial

evidence.  *See In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003); *see also* 5 U.S.C. § 706(2)(E).  Whether an asserted mark is inherently distinctive involves both a legal question as to the correct standard to apply and a factual determination.  "The issue of inherent distinctiveness is a factual determination made by the board."  *See Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1359 (Fed. Cir. 2001).  The PTO has the burden to establish a prima facie case of no inherent distinctiveness.  *See Pacer Tech.*, 338 F.3d at 1350.  Once the PTO sets forth a sufficient prima facie case, the burden shifts to the applicant to come forward with evidence to rebut the prima facie case.  *See id.*

<p style="text-align:center">I</p>

In order to understand the nature of appellant's claim, some background is useful.  In general, trademarks are assessed according to a scale formulated by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10–11 (2d Cir. 1976), which evaluates whether word marks are "arbitrary" or "fanciful,"[2] "suggestive,"[3] "descriptive,"[4] or "generic."[5]  Word marks that

---

[2]  Examples of "arbitrary" or "fanciful" marks include such trademarks as "Rolls-Royce," "Aunt Jemima's," or "Kodak."  *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 429 n.10 (2003).  These marks contain "coined, arbitrary or fanciful words or phrases that have been added to rather than withdrawn from the human vocabulary by their owners, and have, from the very beginning, been associated in the public mind with a particular product . . . and have created in the public consciousness an impression or symbol of the excellence of the particular product in question."  *Id.*

[3]  A suggestive mark "suggests characteristics of the product or service and require[s] an effort of the imagination by the consumer in order to be understood as descrip-

are arbitrary, fanciful, or suggestive are inherently distinctive.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000).  Descriptive marks that acquire secondary meaning may also qualify for protection under Section 2(f), while generic marks generally cannot qualify for trademark protection at all.  *Abercrombie & Fitch*, 537 F.2d at 9–10.

Trademark protection may be secured for "trade dress."  "Trade dress" encompasses the design and appearance of the product and its packaging, and the Supreme Court has held that trade dress can be inherently distinctive.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992).  Here, the Cuffs & Collars worn by

---

tive."  *See, e.g., Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–99 (11th Cir. 2003).  For example, the word mark "LaserSpecialist.com" was determined to be "suggestive" in conjunction with a center for oculoplastic surgery.  *See St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1207–08 (11th Cir. 2009) (upholding jury verdict that mark was suggestive where trademark owner presented evidence that cosmetic surgeons or oculoplastic surgeons were not generally identified as "laser specialist[s]" and thus did not immediately convey the nature of the services offered).

[4]   Descriptive marks merely "describe[] the qualities or characteristics of a good or service."  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  For example, the word "Nu-Enamel" was held to be descriptive of paint enamels.  *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 329–30 (1938).

[5]   A generic mark is one that "refer[s] to the genus of which the product is a species."  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  For example, the term "Shredded Wheat" was found to constitute a generic mark.  *See Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 112–13 (1938).

Chippendales dancers constitutes "trade dress" because it is part of the "packaging" of the product, which is "[a]dult entertainment services, namely exotic dancing for women." U.S. Trademark Application Serial No. 78/666,598 (the "'598 Application").

This court applies a four-part test for determining the inherent distinctiveness of trade dress. This four-part test is set forth in our decision in *Seabrook* as follows:

> [1] whether it was a "common" basic shape or design, [2] whether it was [not] unique or unusual in the particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Seabrook*, 568 F.2d at 1344. If a mark satisfies any of the first three tests, it is not inherently distinctive. *See id.*; 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:13 (4th ed. 2008). The fourth factor, whether the trade dress was capable of creating a commercial impression distinct from the accompanying words, is not applicable here.

Inherent distinctiveness does not depend on a showing that consumers *actually* identify the particular mark with the particular business; this is a question of acquired distinctiveness, or secondary meaning.[6] As we elaborated

---

[6]   *See, e.g., Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 163 (1995) ("'[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844,

in *Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192 (Fed. Cir. 1994), ultimately "the focus of the [inherent distinctiveness] inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive." *Id.* at 1206 (citing *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 582–84 (2d Cir. 1993)). Thus, if the mark is inherently distinctive, it is presumed that consumers will view it as a source identifier. If the mark is not inherently distinctive, it is unfair to others in the industry to allow what is in essence in the public domain to be registered and appropriated, absent a showing of secondary meaning. The policy here is basically the same as the prohibition against registering generic word marks, or descriptive marks that have not acquired secondary meaning.

## II

The first issue we consider on appeal is whether the granting of a Section 2(f) registration for a mark of acquired distinctiveness moots the request for an inherent distinctiveness registration. [7] Although the parties are in

---

851 n.11 (1982))); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1206 (Fed. Cir. 1994) ("We agree with Tone that the district court's analysis on this question confuses the issues of inherent distinctiveness and secondary meaning. To be inherently distinctive trade dress need not, as the district court implies, have an inherent association with the product, or with the owner of the alleged trade dress.").

[7]    Section 2(f) provides:

Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a

agreement that it does not, we are nevertheless obligated to consider the issue. *See, e.g.*, *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) ("While the parties may be permitted to waive nonjurisdictional defects, they may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy,' and on the record before us we feel obliged to address the question of mootness before reaching the merits of appellant's claim." (citations omitted)). We note that this problem is unlikely to arise in the future, as it appears to have resulted from a procedural defect that has since been remedied by the PTO.[8] We nonetheless agree that there are potential collateral consequences resulting from the form of registration under the Lanham Act and that this presents a viable controversy.

---

mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

15 U.S.C. § 1052(f).

[8]   As the PTO described at oral argument, the new procedure requires the examining attorney to explicitly notify the applicant as to the basis for his decision, and give the applicant the option to either appeal the underlying refusal of inherent distinctiveness, or waive the appeal and accept the section 2(f) registration. *See* Oral Arg. at 38:13–38:43; TMEP § 715.02.

All registrations for marks in the Principal Register,[9] regardless of whether the mark has acquired or inherent distinctiveness, are accorded the same benefits and evidentiary presumptions under 15 U.S.C. § 1057(b).[10] Similarly, once a mark has achieved incontestable status under 15 U.S.C. § 1065, it is entitled to the benefits of section 1115(b), which precludes all but a limited number of challenges to a mark's validity or enforceability, such as fraudulent procurement of the mark or abandonment of its use. *See* 15 U.S.C. § 1115(b)(1)-(9); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) (holding that an incontestable mark may not be challenged as merely descriptive).

However, there may be differences in the context of enforcement. Every court of appeals to consider the question has adopted a similar multi-factor test for evalu-

---

[9]   A descriptive term lacking secondary meaning may not appear on the Principal Register, but may appear on the Supplemental Register. *See E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 202 (3d Cir. 2008). Unlike registrations on the Principal Register, registrations on the Supplemental Register do not receive some of the advantages extended to marks registered on the Principal Register. *See* 15 U.S.C. § 1094. Supplemental registration is not prima facie evidence of the validity of the registered mark, of ownership of the mark, or of the registrant's exclusive right to use the registered mark in commerce. *Id.* § 1057(b).

[10]   Section 1057 provides that a certificate of registration of a mark upon the Principal Register "shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the [registrant's] ownership of the mark, and of the [registrant's] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b).

ating the likelihood of confusion necessary to establish a trademark infringement claim,[11] and all of those tests include a factor that inquires into the "strength" of the asserted mark. *See* 4 McCarthy, *supra*, §§ 24:30–24:43; *see, e.g., Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).[12] A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning). *See* 2 McCarthy , *supra*, § 11.83. Thus, whether a particular mark is inherently distinctive may affect the scope of protection accorded in an infringement proceeding. *See, e.g., Tana v. Dantanna's*, No. 09-15123, 2010 WL 2773447, at *5 (11th Cir. 2010); *Boston Duck Tours, L.P. v. Super Duck Tours, L.L.C.*, 531 F.3d 1, 16–17 (1st Cir. 2008); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,

------

[11]   In general, in order to prevail in a trademark infringement case, a plaintiff must show that the alleged infringer "use[d] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion, or to cause mistake, or to deceive*."   15 U.S.C. § 1114(1)(a) (emphasis added).

[12]   For example, the Second Circuit applies the influential "Polaroid test," which applies an eight-factor balancing test to determine the likelihood of confusion: (1) *the strength of the trademark*; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of the consumers in the relevant market.   *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

454 F.3d 108, 115 (2d Cir. 2006).  The potential for benefit in an infringement suit of a registration based on inherent distinctiveness creates a viable controversy.

<div style="text-align:center">III</div>

The second question we consider is the appropriate time for measuring the inherent distinctiveness of a mark.  The PTO on appeal argues that the correct time for measuring inherent distinctiveness is at the time of registration, whereas appellant argues that the correct point in time is when the mark is first in use.

We agree with the PTO's argument on appeal that the proper time for measuring inherent distinctiveness is at the time of registration.  This is in fact the accepted practice at the PTO.  *See, e.g.*, 2 McCarthy, *supra*, § 11.53 ("The Trademark Office will consider the issue of descriptiveness and distinctiveness as existing at the time the application is examined.  If the distinctiveness of the mark has changed since the original application was filed, this will be considered."); TMEP § 1216.01.  Our predecessor court has ruled that "the right to register must be determined on the basis of the factual situation as of the time when registration is being sought."  *In re Morton-Norwich Prods., Inc.* 671 F.2d 1332, 1344 (C.C.P.A. 1982).  For example, in *In re Thunderbird Prods. Corp.*, 406 F.2d 1389 (C.C.P.A. 1969), our predecessor court held that the mark "cathedral hull" was in general use to describe a specific type of boat hull by the time the PTO considered the trademark application.  *Id.* at 1391–92.  The court held that the Board properly concluded that the term "cathedral hull" was descriptive and not registrable as a trademark.  *Id.* at 1392; *see also Remington Prods. Inc. v. N. Amer. Philips Corp.*, 892 F.2d 1576, 1582 (Fed. Cir. 1990) (holding that the phrase "travel care" had "gone into the public domain as a category of goods designation

in the marketplace by reason of its extensive use as such"
by the time the trademark registration was sought, the
point at which the descriptiveness of the mark is properly
determined).

Judging inherent distinctiveness at the time of first
use would be fundamentally unfair.  As we have noted,
"[t]rademark rights are not static."  *Morton-Norwich*, 671
F.2d at 1344; *see Thunderbird Prods.*, 406 F.2d at 1391–
92 (C.C.P.A. 1969).  The test for inherent distinctiveness
depends on whether the mark, or a variation thereof, has
been in common use in general or in the particular field.
A term or device that was once inherently distinctive may
lose its distinguishing characteristics over time.  *See
Thunderbird Prods.*, 406 F.2d at 1391–92.[13]  It would be
unfair for an applicant to delay an application for regis-
tration and then benefit from having distinctiveness
measured at the time of first use.  This would allow an
applicant to preempt intervening uses that might have
relied on the fact that the registration for the mark as
inherently distinctive had not been sought at an earlier
time.

## IV

The final question is whether the PTO erred in hold-
ing that the Cuffs & Collar mark is not inherently distinc-
tive as of the date of the Board's decision.  In making this
determination, the Board appropriately considered evi-
dence of the current situation as well as evidence of
earlier uses, since earlier uses can shed light on the
current situation.  We think the Board erred in suggest-
ing that any costume in the context of the adult enter-

---

[13] We note that the Board erred in stating that
"[t]heoretically, if a mark was inherently distinctive when
applicant began use, it remained so thereafter."  *In re
Chippendales*, 90 U.S.P.Q.2d at 1538 n.6.

tainment industry would lack inherent distinctiveness, but that the Board did not err in its ultimate conclusion.

The three relevant *Seabrook* factors that the Board considered are: "whether the . . . [m]ark is a common basic shape or design," "whether [it] is [not] unique or unusual in the particular field," and "whether [it] is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods or services." *Chippendales*, 90 U.S.P.Q.2d at 1539 (citing *Seabrook*, 568 F.2d at 1344). A finding that any one of these factors is satisfied may render the mark not inherently distinctive. The first *Seabrook* factor essentially asks whether the trade dress is common generally: for example, does it employ a basic shape or design such as a letter or geometric shape? *See Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983) (noting that the trade dress design on sides of shoe could be characterized as a V, an arrow, or a 7, and that "such a basic geometric shape generally is not considered inherently distinctive"). The second factor asks whether the symbol is common in the particular field of use. *See Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985) ("Using a red heart as ornamentation for stuffed animals is . . . far from unique or unusual. . . . [T]he record contains so many examples of use of a red heart motif on teddy bears and other stuffed animals, not to mention all manner of other toys and paraphernalia, that no reasonable argument on this point can be made."). The third factor asks whether or not the mark is a mere refinement of or variation on existing trade dress within the relevant field of use. *See id.* ("The fact that Wiley's alleged mark is a *red* heart, *permanently* affixed to the *left* breast of a *teddy bear* does not, as she claims, serve to distinguish her use of the design from others' uses of hearts on other

stuffed animals.  These characteristics, even if they in combination could be deemed unique, are 'mere refinement[s] of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as dress or ornamentation for the goods.'" (citations omitted)).

We think the Board erred in applying the *Seabrook* standard to the extent that it suggested that *any* costume would lack inherent distinctiveness in the context of the live adult entertainment industry.  The Board seems to lump the Cuffs & Collar together with the examples of a "doctor wearing a stethoscope, or a construction worker wearing a utility belt, or a cowboy wearing chaps and a ten-gallon hat," *Chippendales*, 90 U.S.P.Q.2d at 1541, and notes essentially that "persons performing the same or similar adult entertainment services, whether male or female, routinely wear costumes or uniforms which are, above all, revealing and provocative," *id*.  Similarly, the PTO on appeal appears to adopt this argument as well, suggesting that Chippendales' mark is not inherently distinctive simply because exotic dancers are expected to wear revealing attire.  It is incorrect to suggest that no costume in the context of the live adult entertainment industry could be considered inherently distinctive. Simply because the live adult entertainment industry generally involves "revealing and provocative" costumes does not mean that there cannot be any such costume that is inherently distinctive.  Each such trademark must be evaluated individually under the *Seabrook* factors. The "mere refinement or variation" test is not satisfied by showing that costumes generally are common in the industry.

However, the Board did not err in concluding that the Cuffs & Collar mark is not inherently distinctive under the *Seabrook* test.  The first factor is inapplicable; there

has been no showing that the Cuffs & Collar dress is
common generally.   We need not decide whether the
second factor is applicable.  The third question is whether
the Cuffs & Collar mark constitutes "a mere refinement of
a commonly-adopted and well-known form of ornamenta-
tion for a particular class of goods." *Seabrook*, 568 F.2d at
1344.  That test is satisfied if the Cuffs & Collar mark is a
mere variant or refinement of a particular costume.  The
Board alternatively found the Cuffs & Collar mark not
inherently distinctive because of the existence of the
pervasive Playboy mark, which includes the cuffs and
collar together with bunny ears.

Chippendales argues that it was unfair of the Board
to raise the issue of the Playboy bunny costume sua
sponte, thus preventing it from having the opportunity to
respond.  However, the Board did not err in relying on the
bunny costume, as it was, in fact, Chippendales' own
expert, Dr. Shteir, who provided the article (as an exhibit
accompanying her affidavit) which states that "the collar
and cuffs, *like the bunny suit which inspired them*, has
become a trademark recognized, wherever women take
their entertainment seriously, as a symbol of professional
and classy sexy fun." J.A. 337 (emphasis added).  More-
over, this court may take judicial notice of the existence of
the Playboy bunny trademarks[14] under Fed. R. Evid.
201(c), as we determine that the registration documents
by the PTO are "capable of accurate and ready

---

[14]   The Playboy bunny service mark was first regis-
tered in 1964, and remained in effect until 2004 for "oper-
ating establishments which feature food, drink and
entertainment."      U.S. Trademark  Registration  No.
762,884.  Playboy has acquired numerous other trade-
marks for its bunny suit, including U.S. Trademark
Registration No. 3,319,643 ("casino and nightclub ser-
vices") and 3,392,817 ("bar and hotel services; cocktail
lounge services").

determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (upholding district court's taking of judicial notice of the fact of a patent's reinstatement).

The use of the Playboy mark constitutes substantial evidence supporting the Board's determination that Chippendales' Cuffs & Collar mark is not inherently distinctive. The Playboy bunny suit, including cuffs and a collar, was widely used for almost twenty years before Chippendales' first use of its Cuffs & Collar trade dress. The Cuffs & Collar mark is very similar to the Playboy bunny costume, although the Cuffs & Collar mark includes no bunny ears and includes a bare-chested man instead of a woman in a corset. While the Playboy clubs themselves did not involve exotic dancing, the mark was registered for "operating establishments which feature food, drink and entertainment." The Cuffs & Collar mark was also worn by waiters and bartenders at Chippendales establishments, which Chippendales argues reinforced the association of the mark with the Chippendales brand. Additionally, the pervasive association between the Playboy brand and adult entertainment at the time of the Board's decision leads us to conclude that the Board did not err in considering the mark to be within the relevant field of use. Thus, the Playboy registrations constitute substantial evidence supporting the Board's factual determination that Chippendales' Cuffs & Collar mark is not inherently distinctive under the *Seabrook* test.

Chippendales argues that, even if the Playboy mark were common in the industry, there are separate markets for male adult entertainment and female adult entertainment, and that the relevant field of use is limited to exotic male dancing for women. Chippendales urges that the affidavit of its expert, Dr. Shteir, establishes that the

audience for male and female striptease are entirely
different, and that the nature of the experience underly-
ing each are entirely different. We detect no error in the
Board's approach. The Board considered the affidavit and
ultimately concluded that Dr. Shteir's affidavit was
unpersuasive. *Chippendales*, 90 U.S.P.Q.2d at 1542. The
Board was entitled to conclude, in light of the evidence
and after considering Dr. Shteir's affidavit, that the
relevant market was "adult entertainment," not adult
entertainment specifically for women, and we see no basis
to disturb the Board's finding in this respect.[15]

Finally, Chippendales argues that we should overrule
*Seabrook*, and that the Supreme Court's decision in *Wal-
Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205
(2000), is fundamentally at odds with the *Seabrook* test.
Chippendales proposes an alternative test to "better
address" the issue of inherent distinctiveness and replace
the "outdated *Seabrook* test."[16] Br. of Appellant 58. We

---

[15] Dr. Shteir also argued that the Cuffs & Collar mo-
tif would have been seen by audiences as a source identi-
fier, and thus is inherently distinctive. J.A. 306–07. We
note that this conclusion does not address the *Seabrook*
factors, but rather is directed to the alternative test that
Chippendales proposes to "better address" the issue of
inherent distinctiveness. *See infra*, note 16 and accompa-
nying text.

[16] Chippendales proposed the following test for de-
termining the inherent distinctiveness of trade dress:

1. Is the costume used in a channel of trade
where consumers are conditioned through their
past experience to presume a source identification
function?
2. Is the costume immediately associated with
an iconic larger than life character where the cos-

note that in *Wal-Mart*, the Court merely held that product design trade dress can never be inherently distinctive, and can only qualify for protection through acquired distinctiveness. *Wal-Mart*, 529 U.S. at 214–15.[17] Nothing in the *Wal-Mart* decision questioned or undermined the reasoning in *Seabrook*. Indeed, the Court cited *Seabrook* but did not express any disagreement with its use to determine the inherent distinctiveness of trade dress, although rejecting it as a test for inherent distinctiveness in the context of product design. *Id.* at 213–14. Under these circumstances, the panel is bound by *Seabrook*, and only the court en banc may overturn it. In any event, we fail to see how appellant's proposed test represents an improvement over *Seabrook*.

We conclude that the Board's determination that the Cuffs & Collar mark was not inherently distinctive is supported by substantial evidence. We have considered

---

tume acts as an intrinsic symbol for the character?

If the answer to either question is yes, then the costume is inherently distinctive unless the costume is nothing more than a common depiction of a familiar symbol that preexisted the costume.

If the answer to both (1) and (2) is no, then the costume is not inherently distinctive.

*In re Chippendales*, 90 U.S.P.Q.2d at 1538.

[17]   The Court noted that "[t]he attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product." *Wal-Mart*, 529 U.S. at 212. In contrast, product design "almost invariably serves purposes other than source identification." *Id.* at 213.

21                                        IN RE CHIPPENDALES USA

Chippendales' additional arguments for setting aside the
Board's decision, and we find them to be without merit.

**AFFIRMED**